**HYMAN–MICHAELS COMPANY,**
a Corporation,

v.

**The UNITED STATES.**
No. 49389.

United States Court of Claims.
Decided May 1, 1956.

The plaintiff paid the Government $252,000 for the wire, and removed it from the Shaiba Depot to Basrah, Iraq, where it was placed in storage. The plaintiff promptly began to attempt to resell the wire to a foreign purchaser, but did not succeed in finding one until September 1948. At that time it agreed upon terms of sale with a purchaser, subject to inspection by the purchaser, the seller to guarantee shipment within 60 days after the purchaser established credit. In order to be in a position to make this sale, the plaintiff applied to the proper authorities in Iraq for permission to export the wire. That permission was refused.

On October 21, 1948 the plaintiff advised the Government that it had been definitely denied the right to export the wire; that this was a breach of the plaintiff's contract with the Government, which breach canceled the contract. The plaintiff demanded from the Government the return of the purchase price, plus the plaintiff's moving and storage expenses. Such a claim was filed with the Comptroller General of the United States who, on June 22, 1949, denied it. The plaintiff advised the Government that it was attempting to resell the wire in order to mitigate damages. The Government responded that it had no interest in the wire, but agreed that if the plaintiff resold it, that fact would be without prejudice to whatever rights the plaintiff might be held to have against the Government, except that the resale price should be credited to the Government in case the plaintiff recovered in a suit on the contract.

The plaintiff in 1950 obtained an export permit from Iraq and in 1951 sold the wire to a purchaser in India. The price received was $123,695.02 less than what the plaintiff had paid the Government for the wire plus its costs for moving, storing, obtaining permission to export, and delivering the wire. The plaintiff sues for that amount.

The plaintiff's claim is based upon an interpretation of the language quoted

Max Siskind, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Acting Asst. Atty. Gen. Geo. S. Leonard, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

On September 15, 1947, the Government sold to the plaintiff a quantity of barbed wire estimated at 2,100 long tons, at a price of $120 per ton. The wire was located at Shaiba Depot, in Iraq. The written contract of sale contained the following provision:

"The Seller guarantees that permission to export the property has been granted by the Iraqi Government."

above, which appeared in its purchase contract, which would in effect make that language mean that the Government guaranteed that the Iraqi Government would continue to permit the exportation of the wire for whatever time it might take the plaintiff to make a satisfactory resale of the wire. It says that this was the intention of the parties at the time the contract was made and the language was written.

The negotiations which led to the contract took place in Cairo, Egypt, in September 1947. At that time the parties to the negotiation knew that the plaintiff wanted to purchase the wire for resale and hoped to resell it before exporting it; that the Surplus Property Act of 1944, 50 U.S.C.A.Appendix, § 1611 et seq., prohibited the purchaser from importing the wire into the United States; that some time would be required for the plaintiff to resell the wire and export it from Iraq; that it had required some 18 months for the plaintiff to consummate the resale and export of some surplus property which the plaintiff had purchased from the Government in Europe; that the Government was having some difficulty in obtaining permission from the Government of Iraq to export another lot of barbed wire which had been sold to the Government of Southern Rhodesia. The parties also knew that on September 1, 1947, a Special Committee on Palestine of the United Nations had issued a report containing recommendations for the partition of Palestine; that mass meetings and other demonstrations of protest against this report had occurred in Iraq, Egypt, and elsewhere; that there was unrest in the Arab world over the issue and open talk that armed conflict would result if the recommendations of the Special Committee were carried into effect.

The negotiations were carried on with the foregoing facts in the minds of the parties. The language already quoted,

"The Seller guarantees that permission to export the property has been granted by the Iraqi Government."

was inserted in the contract, as it was in all such contracts made during that period in countries where the Government knew, from previous experience, that a buyer of surplus property might have difficulty in exporting it without aid from our Government in obtaining an export permit.

On its face, the quoted language is a mere assurance of an existing fact, and would leave interested parties to draw their own conclusions and make their own predictions as to how long this fact would continue to be a fact. It is difficult to see how an experienced person such as the plaintiff's vice-president who conducted the negotiation for the plaintiff, and who had recently had great difficulty in arranging for the export of surplus property from a European country, could have read into the contract language more than it said. But the plaintiff has insisted strenuously that the contract language, in the circumstances, was intended by the parties to embody a condition subsequent, entitling the buyer to rescind the contract and be placed in *statu quo ante* if, at any time in the future, the plaintiff desired to export the property and was not permitted to do so.

Because of this insistence we directed a second hearing of the case to permit the plaintiff to prove, if it could, that in spite of the words of the contract, its meaning to the parties was that which the plaintiff urged that it was. The evidence taken in the second hearing does not satisfy us that the language meant anything substantially different from what it said.

The plaintiff points to the answer given by Mr. Dechert, the Government's negotiator in the transaction, when he was asked whether the plaintiff's negotiators were particularly interested in securing some guarantees with respect to exportation from Iraq. The answer was:

"I got the impression that their primary concern was to buy the barbed wire, but a condition of their buying it was their ability—they did not want to buy it unless they felt reasonably sure they could export it after they had sold it."

This answer confirms the fact, which really required no confirmation, because it would necessarily have been in the minds of intelligent and informed negotiators at that time and in that place, that the matter of being allowed to export the wire was of prime importance. But it does not prove that the contract provision which they got, at the end of the negotiation, was meant to be a guaranty that they would still be able to export the wire whenever they desired to do so.

The sale was a cash sale, with immediate delivery to the purchaser, who caused the property to be removed from the Government's Shaiba Depot to a storage place hired by the plaintiff at Margil Wharf in Basrah, Iraq. The moving cost the plaintiff $7,176.17. Storage charges began immediately to accrue. Yet the plaintiff says the Government would not know, perhaps for years, whether the wire had been sold at all, or not. If the condition subsequent, lack of an export permit, should occur, the Government would find that the money it received for the wire would have to be refunded, it would have to pay for the moving, which was of no benefit to it, and the storage, which was apparently of no benefit to it. And whether this condition subsequent occurred or not would be completely beyond the control of the Government. No reasonably prudent individual would make such a bargain for himself, and no competent Government agent would make such a bargain for the Government. A court should not saddle a Government agent with the responsibility for having made such a bargain for the Government, when the contract which he prepared and signed does not express such a bargain, and the evidence is insufficient to persuade the court that such a bargain was intended.

The plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur